No. 14-1845

IN THE

# United States Court of Appeals for the Federal Circuit

IMAGINAL SYSTEMATIC, LLC,

*Plaintiff-Appellant,*

*v.*

LEGGETT & PLATT, INC., SIMMONS BEDDING COMPANY,

*Defendants-Appellees.*

DOES, 1 through 10 inclusive,

*Defendant.*

On Appeal from the United States District Court for the
Central District of California,
Case No. 13-cv-5463
Hon. R. Gary Klausner

## ANSWERING BRIEF OF DEFENDANTS-APPELLEES LEGGETT & PLATT, INC. AND SIMMONS BEDDING COMPANY

Mark S. Parris
Jeffrey L. Cox
Orrick, Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, WA 98104-7097
(202) 839-4300

Eric A. Shumsky
Orrick, Herrington & Sutcliffe LLP
1152 15th Street, NW
Washington, D.C. 20005-1706
(202) 339-8400

Marc R. Shapiro
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for Defendants-Appellees*

'402 patent: claim 1
(claim 8 listed on back inside cover)

1. A method of forming a portion of a box spring or mattress foundation, the method comprising:

providing a base;

locating a wood frame on the base, the wood frame including a plurality of spaced apart, generally parallel frame sections;

locating a plurality of modules arranged in a plurality of rows on the frame, each row including a plurality of modules formed from a continuous metal wire with each module having a top portion spaced apart from the frame, first and second side portions extending downwardly from the top portion, and a bottom portion connecting the first and second side portions, the bottom portion being positioned on one of the frame sections and the first and second side portions of the module being spaced apart to define an open access area above the bottom portion;

locating a fastening tool above the base;

providing a module alignment device;

moving the module with the module alignment device;

moving the fastening tool without the use of a vision guidance system in a direction generally perpendicular relative to the base and through the open access area of a module until the fastening tool is located at a target fastening location; and

securing the bottom portion of the module to the frame at the target fastening location with the fastening tool.

A45, cols. 5:62-6:22.

# CERTIFICATE OF INTEREST

Counsel for appellees certify the following:

1.      We represent Leggett & Platt, Incorporated and Simmons Bedding Company.

2.      As of January 1, 2015, Simmons Bedding Company is known as SSB Manufacturing Company.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are as follows.

Leggett & Platt, Inc.:  None.

Simmons Bedding Company:  Dawn Holdings, Inc.

4.      The names of all law firms and the partners or associates that appeared for party or amicus now represented in trial court or agency or are expected to appear in this court are:

ORRICK, HERRINGTON & SUTCLIFFE LLP:

Eric A. Shumsky
Mark S. Parris
Marc R. Shapiro
Jeffrey L. Cox
Paul F. Rugani
William A. Molinski

Date:  March 9, 2015          Orrick, Herrington & Sutcliffe LLP

/s/ Eric A. Shumsky
Eric A. Shumsky
*Counsel for Defendants-Appellees*
*Leggett & Platt, Incorporated and Simmons*
*Bedding Company*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ..................................................................... v

STATEMENT OF RELATED CASES .................................................... ix

INTRODUCTION ...................................................................................... 1

JURISDICTION ......................................................................................... 4

STATEMENT OF ISSUES ........................................................................ 4

STATEMENT OF THE CASE .................................................................. 5

    The '789 Patent .................................................................... 7

    The '402 Patent ................................................................. 10

    The TopOff Machines ....................................................... 16

    The Proceedings Below ..................................................... 20

SUMMARY OF ARGUMENT ................................................................ 24

ARGUMENT ........................................................................................... 29

I.    THE JUDGMENT SHOULD BE AFFIRMED BECAUSE
    IMAGINAL'S PROPOSED CONSTRUCTION OF "VISION
    GUIDANCE SYSTEM" WOULD IMPERMISSIBLY
    NARROW THE CLAIM. ............................................................ 29

    A.    Imaginal's Proposal Contravenes Fundamental Canons
        of Claim Construction. ....................................................... 29

    B.    The District Court's Construction Is Consistent With
        The Claim Language And Specification. ............................ 45

    C.    Alternatively, Non-Infringement May Be Affirmed
        Under The Similar Construction Proposed By
        Defendants. ......................................................................... 52

    D.    The Determination Of Non-Infringement Should Be
        Affirmed, And Certainly There Is No Basis To Enter A
        Judgment Of Infringement. ................................................ 55

II.    IF THE COURT REVERSES THE CONSTRUCTION OF
       "VISION GUIDANCE SYSTEM" AND REMANDS, IT ALSO
       SHOULD REVERSE THE DISTRICT COURT'S
       CONSTRUCTION OF "MOVING THE MODULE WITH
       THE MODULE ALIGNMENT DEVICE." ................................... 57

III.   THIS COURT SHOULD NOT ASSESS DAMAGES IN THE
       FIRST INSTANCE BECAUSE IMAGINAL'S COLLATERAL
       ESTOPPEL THEORY IS BOTH WAIVED AND MISTAKEN. ... 65

CONCLUSION ....................................................................................... 73

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
350 F.3d 1365 (Fed. Cir. 2004) ........................................... 37

*3M Innovative Props. Co. v. Tredegar Corp.*,
725 F.3d 1315 (Fed. Cir. 2013) ........................................... 44

*Ajinomoto Co. v. ITC*,
597 F.3d 1267 (Fed. Cir. 2010) ........................................... 49

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ........................................... 30

*Apple, Inc. v. Samsung Elecs. Co.*,
926 F. Supp. 2d 1100 (N.D. Cal. 2013) ............................... 72

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
448 F.3d 1324 (Fed. Cir. 2006) ........................................... 64

*Applied Med. Res. Corp. v. U.S Surgical Corp.*,
435 F.3d 1356 (Fed. Cir. 2006) ............................... 68, 69, 70

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008) ............................... 32, 37, 60

*Bradford Co. v. Jefferson Smurfit Corp.*,
Nos. 00-1511, 00-1546, 2001 U.S. App. LEXIS 25205
(Fed. Cir. Oct. 30, 2001) ..................................................... 72

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002) ........................................... 37

*e.Digital Corp. v. Futurewei Techs., Inc.*,
772 F.3d 723 (Fed. Cir. 2014) ............................................. 67

*Ekchian v. Home Depot, Inc.*
104 F.3d 1299 (Fed. Cir. 1997) ..................................... 33, 62

*Energy Transp. Group, Inc. v. William Demant Holding A/S*,
  697 F.3d 1342 (Fed. Cir. 2012) ........................................................ 66

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ........................................................ 36

*Fenner Invs., Ltd. v. Cellco P'ship*,
  No. 13-1640, 2015 U.S. App. LEXIS 2203
  (Fed. Cir. Feb. 12, 2015) .................................................................. 30

*Gemstar-TV Guide Int'l, Inc. v. ITC*,
  383 F.3d 1352 (Fed. Cir. 2004) ........................................................ 40

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970) .................................................. 70

*H-W Tech., L.C. v. Overstock.com, Inc.*,
  758 F.3d 1329 (Fed. Cir. 2014) ........................................................ 31

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*,
  222 F.3d 951 (Fed. Cir. 2000) .......................................................... 33

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ........................................................ 30

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001) .................................................. 31, 63

*KCJ Corp. v. Kinetic Concepts, Inc.*,
  223 F.3d 1351 (Fed. Cir. 2000) .................................................. 32, 37

*In re Lambert*,
  233 Fed. App'x. 598 (9th Cir. 2007) ................................................ 67

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ........................................................ 70

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) ............................................................ 31

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014) ................................................................ 40, 44

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
   601 F.3d 1359 (Fed. Cir. 2010) .......................................................... 32

*Nystrom v. Trex Co.*,
   580 F.3d 1281 (Fed. Cir. 2009) .......................................................... 68

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) .......................................................... 62

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................... 30, 31, 36, 45, 46

*RF Del., Inc. v. Pac. Keystone Techs., Inc.*,
   326 F.3d 1255 (Fed. Cir. 2003) .......................................................... 67

*Rheox, Inc. v. Entact, Inc.*,
   276 F.3d 1319 (Fed. Cir. 2002) .......................................................... 62

*Sage Prods., Inc. v. Devon Indus., Inc.*,
   126 F.3d 1420 (Fed. Cir. 1997) .......................................................... 66

*Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001) .......................................................... 38

*Seachange Int'l, Inc. v. C-Cor Inc.*,
   413 F.3d 1361 (Fed. Cir. 2005) .......................................................... 62

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
   607 F.3d 784 (Fed. Cir. 2010) ........................................................... 32

*SmithKline Beecham Corp. v. Apotex Corp.*,
   439 F.3d 1312 (Fed. Cir. 2006) .......................................................... 49

*Syngenta Seeds, Inc. v. Monsanto Co.*,
   231 Fed. App'x. 954 (Fed. Cir. 2007) ................................................. 63

*Tandon Corp. v. U.S. Int'l Trade Comm'n*,
   831 F.2d 1017 (Fed. Cir. 1987) .......................................................... 64

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002) .......................................................... 38

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015) ........................................................................ 30

*Texas Instruments, Inc. v. U. S. Int'l Trade Comm'n*,
   805 F.2d 1558 (Fed. Cir. 1986) .................................................... 43

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ............................................... 37, 38

*United Carbon Co. v. Binney & Smith Co.*,
   317 U.S. 228 (1942) ......................................................................... 42

*White v. Dunbar*,
   119 U.S. 47 (1886) .......................................................................... 44

*Wolfson v. Brammer*,
   616 F.3d 1045 (9th Cir. 2010) ...................................................... 67

## FEDERAL STATUTES

28 U.S.C. § 1292(c) ..................................................................... 4, 24

## OTHER AUTHORITIES

*The American Heritage Dictionary of the English Language*
   (4th ed. 2000) ................................................................................. 47

Beautyrest, http://www.beautyrest.com/ (last visited Mar. 5,
   2015) .................................................................................................... 5

merriam-webster.com, http://www.merriam-
   webster.com/dictionary/vision) ................................................. 46

## STATEMENT OF RELATED CASES

There were two prior appeals between the same parties arising out of related litigation.  Both arose out of claims of infringement levied against older versions of the devices at issue here.  The first appeal and this appeal share one patent in common—specifically, U.S. Patent No. 7,222,402 (the '402 patent), asserted by Plaintiff Imaginal Systematic, LLC ("Imaginal").  A judgment of infringement was entered in favor of Imaginal, and against Defendants Leggett & Platt, Inc. ("Leggett") and Simmons Bedding Company ("Simmons").  Defendants appealed; this Court affirmed the judgment on February 14, 2013.  *See Imaginal Systematic, LLC v. Leggett & Platt, Inc.*, No. 12-1313, 496 F. App'x 997 (Rader, C.J., Reyna, J., and Davis, U.S. District J., sitting by designation).

Following remand, Imaginal sought and was awarded prejudgment interest.  Leggett and Simmons appealed because Imaginal's request for prejudgment interest was untimely.  Following briefing of that appeal, but before oral argument, the appeal was dismissed by agreement of the parties as part of a settlement that resolved all issues pertaining to an older version of the machines at

issue here.  *See* A2667-69.  That settlement did not fully resolve issues pertaining to redesigned machines, which Imaginal claimed to be infringing in a further lawsuit it had filed in the meantime, and which are at issue in this appeal.

## INTRODUCTION

Imagine that Nellie Knoll invents an automated system for building furniture—specifically, for assembling the components of a cabinet into a finished whole. Nellie secures a patent, which we'll call the '002 patent. Importantly, to avoid the expense involved in prior-art systems with computerized controls (and to avoid the prior art itself), Nellie's system uses mechanical controls, and the patent claim includes a negative limitation: "assembling the cabinet without the use of a computer." The '002 patent does not define "computer," but it does reference an earlier Nellie patent (the '001 patent) that discloses multiple types of computers—bare-bones calculators for performing simple math operations; sophisticated servers that guide machine tools with precision; and even mainframe computers controlling different aspects of the apparatus.

Enter Charles ("Chip") Pendale, a renowned furniture maker. He builds, markets, and sells a machine akin to the one claimed in the '002 patent, but which *does* use a computer to direct its functions. Nellie Knoll sues; Chip Pendale defends himself on the theory that his device uses a computer. Nellie's response? "When I said 'computer,' I meant

'an IBM.'"  That argument would be laughed out of court, and it should

be here too.  This case differs only in that it involves box springs instead

of cabinets; "vision guidance systems" instead of computers; and the

addition of a prosecution history in which Imaginal told the examiner

the opposite of what it contends here.  If words can be twisted so easily,

the patent system cannot function.

In particular, this case concerns Imaginal's '402 patent (U.S.

Patent No. 7,222,402), which is directed to a process for building "box

springs"—the base that provides support for a mattress.  The patent

claims a method and apparatus (although only the former is at issue)

for securing wire coils (referred to as "modules") to a wooden frame.

Once the coils are fastened to the frame, they typically are covered with

a taut cloth exterior to assume the familiar form.

During a critical step of Imaginal's claimed method, an industrial

stapler must descend to the spot where the module is to be stapled to

the frame.  To avoid the prior art, Imaginal specifically disclaimed—

through a negative claim limitation—use of a "vision guidance system"

for performing this task.  Instead, to take advantage of the industry's

adoption of wire grids in place of spring coils, this step would be

performed mechanically, using wings to guide the stapler into place. The '402 patent does not define the generic term "vision guidance system," and in fact it explicitly recognizes that there are multiple types of vision guidance systems.

Here, however, to avoid a construction that Imaginal does not dispute would lead to non-infringement as a matter of law, Imaginal argues that "vision guidance system" means something (what precisely is unclear) disclosed in Imaginal's own, earlier '789 patent (U.S. Patent No. 5,904,789). But the '402 patent's disclaimer is not so limited. It uses a generic term; the '402 patent describes vision guidance systems separate and apart from the '789 patent; and the '789 patent itself describes a range of vision guidance systems. If Imaginal wanted to disclaim some particular "vision guidance system of the '789 patent," it could easily have done so, including by using that very language in the claims.

The district court properly understood that permitting Imaginal to limit its broad disclaimer to one, specific, sophisticated form of vision guidance system is every bit as misplaced as Nellie Knoll's argument that the only kind of computer is an IBM. Because the construction

3

proposed by Imaginal is incorrect, the order granting summary judgment to Defendants should be affirmed.

## JURISDICTION

The district granted summary judgment of non-infringement as to certain of Defendants' products, based on its construction of key claim terms.  A5-10.  Imaginal filed an interlocutory appeal of the determination of non-infringement under 28 U.S.C. §1292(c)(2). Subsequently, the parties settled the remainder of the litigation. A2667-69.

## STATEMENT OF ISSUES

1.  Imaginal does not dispute that the judgment of non-infringement was proper unless it can prevail on its preferred construction of "vision guidance system."  Did the district court properly reject Imaginal's proposed construction, which would define the generic term "vision guidance system" by exclusive reference to one example of such a system in a manner contrary to the specification, contrary to the prosecution history, and contrary to the rule against importing limitations from the specification into the claims?

2.  Whether, in the alternative, the Court should affirm the determination of non-infringement because, properly construed, the

claim term "moving the module with the module alignment device" requires movement of a single module at a time.

3.  Imaginal has argued for the first time on appeal that, as a matter of collateral estoppel, a lump-sum damages award related to earlier products can be converted into a per-use royalty and applied to the redesigned products at issue here.  Was this argument properly preserved, and if so, has Imaginal met its burden of establishing collateral estoppel under these circumstances?

## STATEMENT OF THE CASE

This case concerns methods by which box springs are made.  The defendants are major players in the bedding industry.  Leggett designs, invents, and manufactures a variety of products used in the bedding industry.  A1521.  These include equipment to assemble bedding components, such as the industrial TopOff machines that spawned this litigation. *Id.*; A1.  Simmons creates, develops and produces bedding products, including its well-known Beautyrest® and ComforPedic® bedsets.  *See, e.g.,* Beautyrest, http://www.beautyrest.com/ (last visited Mar. 5, 2015).  Between 2005 and 2008, Simmons purchased 11 TopOff

machines from Leggett, which it used to make box springs.  A1467, 1505.

Simmons' use of those TopOff machines (which we call "the Original TopOff Machines" to differentiate them from redesigned machines subsequently at issue) resulted in an initial lawsuit ("the First Lawsuit") between these same parties.  *See* Complaint, *Imaginal Systematic, LLC v. Leggett & Platt, Inc.*, No. 10-07416 (C.D. Cal. July 29, 2013), ECF No. 1.  Imaginal alleged that Leggett and Simmons infringed three of its patents:  U.S. Patent No. 6,935,546; the '402 patent; and U.S. Patent No. 7,467,454.  A1040.  The case went to trial, and in 2012, a jury awarded Imaginal lump-sum damages for Defendants' past use of the Original TopOff machines.  A2.  After that judgment was affirmed by this Court, Imaginal for the first time asked the district court to impose a running royalty for future infringing use of the Original TopOff machines.  The court declined, given the tardiness of the request.  *Id.*

In the meantime, Leggett had gone back to the drawing board to redesign the Original TopOff machines to avoid infringement.  A5. Leggett introduced the redesign in 2014, and Simmons' machines were

modified accordingly.  *Id.*  We call these modified machines "the Redesigned TopOff Machines."  Before the redesign was complete, Imaginal brought a further action ("the Second Lawsuit") that claimed infringement by virtue of the continued use of the Original TopOff machines during the redesign period.  A2; *see* A70-78.  Subsequently, Imaginal alleged that the Redesigned TopOff Machines also infringed the '402 patent, albeit for different reasons.  A998-1010.

Because the '402 patent asserted here references an earlier patent—the '789 patent—we begin there.

### The '789 Patent

Imaginal is the assignee of the '789 patent, issued in 1999, which is directed to automatic stapling machines and methods for stapling coils to a wood frame.  A1105; *see* A1118, col. 1:24-28; A1125, col. 16:36-39; A1126, col. 18:5-24; A1126 cols. 18:43-19:4.  Or, as your average consumer would understand it, the patent covers technology for making box springs.  This apparatus "is designed to automate the box spring stapling process," so that the box springs are not "limited to the capability of the individual hired to staple the box spring to the

modules." A1118, col. 1:20-23.  Figure 2 is a representative illustration

of the stapling machine, viewed from the side:



A1107 (coloration added).  Key components are the stapler apparatus

(64), which includes the stapler (90), and the box spring (56).

More specifically, the machine contains a "base" (12, shown in

Fig. 1 but not above), which supports the wood frame of the box spring

(58).  A1118, col. 1:45-46; A1125, col. 16:37; A1126, col. 18:8, 45.  A rack

of metal coils or springs (62), referred to in the patent as "modules,"

A1118, col. 1:13-14, are coupled to "a wire grid" (60). A1120, col. 5:51-52. The modules and wire grid are placed on the wood frame, then affixed to it using "a tool." A1118, cols. 1:66-2:3. The tool is commonly referred to in the patent as a "stapler," *e.g.*, A1118, col. 1:24-28, although it is not so limited, and various dependent claims claim "a stapler," "a nailer," and "a glue dispenser." A1126, col. 17:29-32. Consistent with the patent's terminology, we refer generically to "stapling" the coils or the modules to the frame.

Relevant here, the '789 patent "includes a vision guided stapling apparatus which automatically locates the modules on the wood frame and then guides the stapler into proper position to secure the modules to the wood frame automatically." A1118, col. 1:24-28; *see, e.g.*, A1125, col. 16:43-46 (Claim 1: "a camera coupled to the support, the camera providing an image signal indicative of an actual position of the modules relative to the frame upon relative movement of the support and the base").

The '789 patent describes numerous variants of such a system. Of the 31 claims of the '789 patent, each except for claim 29 requires using a camera to guide the stapler into position to staple the modules to the

9

frame.  The claims include simple systems in which the camera merely shows the position of the modules relative to the frame (A1125, col. 16: 42-46 (Claim 1)), and slightly more complex systems in which the camera is "pivotably mounted to the support" (A1126, col. 17:7-8 (Claim 6).  It claims yet more complex systems that include "memory for storing an optimum position for each of the modules" (A1125, col. 16:55-56 (Claim 2)); that compare the actual and optimum positions of the module (A1125-26, cols. 16:67-17:1 (Claim 4)); and that store images of the module and designated targets for the tool (A1126, col. 17:43-59 (Claims 18-21).  There even is a version of the system with not one but *two* cameras, to separately track different aspects of the apparatus. A1126, col. 17:33-42 (Claims 17, 18).

Nowhere does the '789 patent use, much less define or delimit, the generic term "vision guidance system."

### The '402 Patent

As often happens, technology changed, and manufacturers of box springs replaced individual wire coils (feature 62 in Figure 2 of the '789 patent) with grids made of rows of bent wires (colored features 12, 14, 16 and 18 below) held in a relatively rigid structure.



A38, Fig. 2.  In part to respond to this change, in November 2005

Imaginal applied for (and ultimately obtained) the '402 patent on a

different method for building box springs.  A36.  Although the patent

purports not to be limited to box springs using rows of wires, *see* A43,

col. 1:19-30, its claimed method abandons the vision-guided staplers

that were suited to maneuvering around wire coils.  Instead, it employs

a mechanical guidance system that operates effectively in the V-shaped

spaces in these wires.

Specifically, the patent describes a "base" that supports the frame

of the box spring and the wire modules; and a "support" positioned

above the base that holds the fastening tool.  A43, col. 1:56-61; A44,

col. 3:11-20 (discussing the illustration of this apparatus in Figure 1).

Those features are necessary to hold the wood frame in the machine

and to support the stapler.  The claimed innovation was the use of a

mechanical assembly to guide the fastening tool to where the wire grid

is to be attached to the wood frame.  A preferred embodiment of this

mechanical assembly, viewed from the side as it descends into the

V-shaped wire module, is depicted in Figures 5, 6, and 7:



A40-42 (coloration added).

"A mechanical guide **32** is coupled to the tool **30** in order to

mechanically position the tool **30** in a proper fastening position relative

to each module **14**."  A44, col. 3:15-17, 41-44.  Feature (20) is the bottom

of the wire module, and (22) is a portion of the wood base.  A44, col. 3:2-

10.  In its initial position, the guide appears like outstretched wings

attached to the stapler.   As the stapler and guide descend into the

module (Figure 5), the wings "engage the wire and guide the stapler

head" downward toward the target fastening location.   A44, col. 4:12;

*see generally* A44, col. 4:12-21.

In Figure 6, the stapler continues to descend, and rollers (54)

engage the sides of the module.  A44, col. 4:22-30.  Ultimately, as shown

in Figure 7, the "guide wings 38 and 40 pivot upwardly … and [the

stapler head] engages the target on bottom section 20."  A44, col. 4:31-

35.  The wings ensure that, as the stapler descends, the base of the wire

module is aligned under the center of the nose of the stapler.  A44,

col. 4:35-59.

As the claims make clear, the method is accomplished without the

use of a vision guidance system.  Imaginal has asserted claims 1 and 8

here; claim 1 is representative:

> A method of forming a portion of a box spring or
> mattress foundation, the method comprising:
>
> [1] providing a base;

13

[2] locating a wood frame on the base, the wood frame including a plurality of spaced apart, generally parallel frame sections;

[3] locating a plurality of modules arranged in a plurality of rows on the frame, each row including a plurality of modules formed from a continuous metal wire with each module having a top portion spaced apart from the frame, first and second side portions extending downwardly from the top portion, and a bottom portion connecting the first and second side portions, the bottom portion being positioned on one of the frame sections and the first and second side portions of the module being spaced apart to define an open access area above the bottom portion;

[4] locating a fastening tool above the base;

[5] providing a module alignment device;

[6] *moving the module with the module alignment device*;

[7] *moving the fastening tool without the use of a vision guidance system in a direction generally perpendicular relative to the base and through the open access area of a module until the fastening tool is located at a target fastening location*; and

[8] securing the bottom portion of the module to the frame at the target fastening location with the fastening tool.

A45, cols. 5:61-6:22 (numbering added; emphasis added[1] to contested

elements).[2]

At issue here are the terms "moving the module with the module

alignment device" (step 6) and "vision guidance system" (step 7).

Imaginal's appeal focuses on "vision guidance system," which is part of

a negative claim limitation ("without the use of a vision guidance

system"). The '402 patent acknowledges that there are multiple types

of vision guidance systems. One is "the vision guidance system of the

'789 patent." A43, col. 1:49-51. The '402 patent also recognizes other

types of vision guidance systems:

> It is understood that the mechanical guide 32
> may also be used with a vision guidance system.

---

[1] Emphasis is added throughout the document unless otherwise noted.

[2] Claim 8 is similar. Its eight steps track the eight steps of claim 1, and
contested steps 6 and 7 are similar:

> [6] moving the module with the module alignment device to
> compensate for misalignment of the module relative to at least one
> of the frame section and the fastening tool; [and]

> [7] moving the fastening tool relative to the base, the plurality of
> spring modules and the frame without the use of a vision guidance
> system until the fastening tool is located at a target fastening
> location.

A45, col. 6:56-62 (numbering added).

> In this embodiment, the vision guidance is less
> exact in guiding the stapler 30 directly to the
> target as in the '789 patent, but could provide
> vision guidance to an initial position adjacent
> each module.

A44, col. 3:49-54; *see also* A45, col. 5:22-26 ("As discussed above, vision

guidance (generally shown as sensor 31 in FIG. 1) may be used to

determine that the modules are in the standard positions and make

sure that the tool 30 is initially aligned with the module 14.").

### The TopOff Machines

The Second Lawsuit, which gave rise to this appeal, took aim at

Simmons' residual use (following judgment and prior to redesign) of the

Original TopOff machines.  A2; *supra* at 6-7.  Like the Original TopOff

Machines, the Redesigned TopOff Machines staple wire grids to wood

frames to form box springs.  A1040-41, 1288.  We have submitted to the

Court a Supplemental Video Appendix that demonstrates the

Redesigned TopOff Machines in operation.  In brief, the process is

initiated by a human operator who places a wood frame on a loading

table, then places a wire grid on top of the wood frame.  A1284-85.  As

illustrated in Exhibit 4 of the Supplemental Video Appendix and below,

the grid is made of wires bent to form a row of v-shaped "modules." Rows of modules are held together by supporting wires.  A988.



A1284.  The operator pushes the wood frame and the wire grid into the machine.  A1284-85.



Staplers, which are suspended in a row above the wire grid, descend and staple the bottom of each module to the wood frame—one row at a time, as the wood frame and wire grid move together through the machine—thereby securing the grid in place and creating the structure of the mattress.  A1285.

The Original TopOff Machines used positioning software and mechanical devices to control the alignment of the modules vis-à-vis the staplers.  Those mechanical devices, called "gripper feet," were attached to the nose of each stapler, so that when a stapler descended, the feet "grippe[d]" the wire at the base of the module to move it directly under the nose of the stapler, allowing for precise stapling.  A1044.

Following the First Lawsuit, Leggett redesigned the machines to avoid infringement.  Recall that the '402 patent requires that "the fastening tool" be moved to a "target fastening location" "without the use of a vision guidance system."  A45, col. 6:16-20; *supra* at 14.  To fall within this negative claim limitation and thereby to avoid infringement, Leggett modified the method by which the staplers moved down to the target fastening location at the base of each module.  Gone were the positioning software and gripper feet.  A5, 1283.  In their place, the

18

Modified TopOff Machines substituted a vision guidance system that controls the staplers through their descent to the target fastening location, and ensures alignment between the staplers and the base wires of the modules.  As the district court explained, "[t]he Cognex System is a computer system that uses an optical sensor [i.e., camera] to control the movement of both a gripper carriage on which a wood frame and one grid of modules are placed, and the stapling device."  A5; *see* A1289-90 (expert declaration explaining same).

The camera in the Cognex vision guidance system detects when the modules are correctly aligned with the staplers; controls the staplers during their downstroke to the targets; and watches to ensure that the targets remain correctly aligned until the staplers fire the staples.  A1292.  If at any point during the staplers' downward movement the camera detects that the wire grid comes out of alignment, it sends a signal to the computer to stop the staplers' movement.  *Id.*  A computer then readjusts the aim of the staplers by repositioning the wooden frame—it shifts the frame back and forth until the targets are realigned.  A1293.  Once the camera sees that the target is properly aligned, it sends a signal to the computer, which

19

allows the stapler to continue its descent.  *Id.*  The image below depicts the camera, A1290; the standard process is illustrated in Exhibit 5 of the Supplemental Video Appendix; the realignment process is illustrated in Exhibit 6.  A988; *see also* Supplemental Video Appendix, Exs. 4, 7-8.



### *The Proceedings Below*

In the Second Lawsuit, Imaginal initially asserted infringement based on Defendants' use of the Original TopOff Machines during the redesign period, and subsequently asserted infringement based on their

use of the Redesigned TopOff Machines.  Regarding the Original TopOff

Machines, the district court concluded that infringement of the '402

patent was established by the verdict in the First Lawsuit.  A3.  As to

the Redesigned TopOff Machines, however, the court determined

following claim construction that they do not infringe.  A8-10.

Specifically, the court concluded that there could be no

infringement under a proper construction of the term "without the use

of a vision guidance system."  A6-10.  It rejected Imaginal's argument

that this generic term is limited to "the vision guidance system … [of]

the '789 patent."  A7.  In the district court, as here, Imaginal argued

that when it disclaimed use of "a vision guidance system," it was only

disclaiming the use of some particular vision guidance system—what it

called "the vision guidance system of the '789 patent"—and, moreover,

it further sought to limit that disclaimer to the narrowest, most

sophisticated vision guidance system among the many claimed or

described in the '789 patent.  *See* A2007-08; Opening Brief ("OB") 8-12,

30.  On that basis, Imaginal argued, "vision guidance system" should be

construed to mean a system in which "a camera … adjust[s] the aim of

the staple[r]."  A2007-08 (emphasis omitted).  Leggett and Simmons

21

proposed to construe "'Vision Guidance System'" to mean "an alignment system that uses a vision-based sensor"—a construction they explained accords with the claim language and written description of the '402 patent. A1331 (emphasis omitted).

The court determined that "'vision guidance system'" has no special or technical meaning, and therefore requires minimal construction. A7. The court relied upon a general-purpose dictionary relied upon by Imaginal, *see* A2007, but reached a different result. Specifically, the court concluded that a "'vision guidance system'" is "a 'system that uses a vision or sight based method to control or direct the movement or direction of something.'" A7. Thus, because the Cognex System in the accused products is a "vision guidance system" and, because step 7 of Claims 1 and 8 "limits the method to one that moves the fastening tool *without* the use of a vision guidance system," the Redesigned TopOff Machines do not infringe. A9-10 (emphasis in original).

The second contested term was "'moving the module with the module alignment device.'" Leggett and Simmons proposed construing the phrase as "'moving a single module of a plurality of modules with

the module alignment device.'" A1337. This construction would make clear that "*the* module" means just that: a single module. Imaginal offered no construction. A2008.

The court, however, reasoned that "there is nothing in the claim language or the specification that excludes movement of a single module by moving the entire unit of modules that is comprised of a plurality of modules." A7. It thus construed the phrase "'moving the module with the module alignment device'" to mean "'moving a single module (by directly or indirectly moving either that module or the unit of modules in which the single module is contained), using a device that aligns the module and stapler, or the module and the frame.'" A7. The court further determined that by moving the wood frame and the grid of modules to align the module with the stapler, the Redesigned TopOff Machine satisfies step 6 of the asserted claims. *Id.*

With claim construction resolved, and the Redesigned TopOff Machines determined to be non-infringing, the case was slated for trial on the only remaining issue: damages for the Original TopOff Machines in the period after the First Litigation. Imaginal argued that no trial was necessary because the court could convert the jury's lump-sum

23

damages award from the First Litigation into a per-use royalty rate. A323-26. Imaginal made this argument "only" with regard to the Original TopOff Machines. A310. The court declined to apply collateral estoppel to the old machines, explaining that such an undertaking would require impermissible speculation about a determination the jury did not make. A4-5.

Rather than proceed with the damages trial, Imaginal appealed under 28 U.S.C. § 1292(c). A2575-76. Shortly thereafter, and before Imaginal filed its opening brief in this Court, the parties entered into a settlement that finally resolved various issues, including damages with regard to the Original TopOff Machines. A2667-69. Imaginal now challenges claim construction (and infringement) with regard to the Redesigned TopOff Machines, and asks this Court to convert (on a theory of collateral estoppel) the lump-sum damages award regarding the Original TopOff Machines into a per-use royalty for the Redesigned TopOff Machines.

## SUMMARY OF ARGUMENT

I.A. The Court should reject Imaginal's proposed construction of "without the use of a vision guidance system." That construction is not

faithful to the plain language of the '402 patent's claims, and it seeks to import a limitation from another patent that itself did not define the term. Imaginal would treat the term as meaning "without the use of the vision guidance system of the '789 patent," a formulation that Imaginal repeatedly identifies as the basis for its proposed construction ("a system in which a camera is used to adjust the aim of the fastening tool to a target fastening location"). But Claims 1 and 8 of the '402 patent do not disclaim only one vision guidance system, but rather the use of "a" vision guidance system. And the specification of the '402 patent itself recognizes that there are multiple types of vision guidance systems.

Even if a limitation could be imported from the specification into the claims in this fashion, it would make no sense to do so here because the '789 patent does not identify just one type of vision guidance system; it identifies numerous forms of such systems. And even Imaginal, in its claim construction papers and its brief to this Court, does not consistently identify what vision guidance system from the '789 patent it thinks was incorporated by reference and therefore disclaimed.

In addition, Imaginal should not be heard to argue for limiting the meaning of "vision guidance system" because, during reexamination of the '402 patent, Imaginal clearly and repeatedly argued that the term extends far more broadly.  It argued that even the human eye is a vision guidance system—a far cry from its current argument that the term should be limited to some aspect of the '789 patent.  As Imaginal argued then, limiting the term to less than its generic meaning would impermissibly import a limitation from the specification into the claims.

B.  The district court's construction, like Defendants', is consistent with the claim language and specification of the '402 patent.  Following the approach advocated by Imaginal earlier in this litigation, and using the very dictionary Imaginal offered here, the court construed "without the use of a vision guidance system."  It considered the terms "vision," "guidance," and "system," recognized that none is a term of art or has specialized meaning in this context, and thus determined that "a vision guidance system" is a "system that uses a vision or sight based method to control or direct the movement or direction of something." Defendants' similar construction likewise took account of the "vision" and "guidance" components of the system—namely, "an alignment

system that uses a vision-based sensor." These similar constructions both account for the different forms of vision guidance systems discussed in the '402 patent. Imaginal does not contend that the Redesigned TopOff Machines infringe under either construction. Accordingly, upon rejecting Imaginal's proposed construction, the Court should affirm.

II. Even if the Court agreed with Imaginal's construction of "without the use of a vision guidance system," affirmance is appropriate on alternate grounds. In particular, if necessary to resolve the appeal, the Court should modify the construction of "moving the module with the module alignment device." The use of the definite article "the" in this claim term contrasts with the use of the *in*definite article "a" in the term discussed above, and makes clear that only one module is to be moved. The district court acknowledged the use of the definite article, but nonetheless interpreted this term to encompass moving an entire grid of modules: "moving a single module (by directly or indirectly moving either that module or the unit of modules in which the single module is contained)." That construction is inconsistent with the plain meaning of the claim, as confirmed by both the specification (which

showed only a single module being moved), and the prosecution history (during which Imaginal distinguished prior art references on the basis that they were limited to devices that could not move just one module at a time). It is undisputed that, like that prior art, the Redesigned TopOff Machines cannot move just one module at a time. Under the proper construction, non-infringement must be affirmed.

III. Imaginal asks the Court to adopt its preferred claim construction; turn a determination of non-infringement into a judgment of infringement; then apply collateral estoppel to impose a damages award for the first time on appeal. This argument is waived: Not only did Imaginal never make this request with regard to the Redesigned TopOff Machines, which are the only devices at issue here, it explicitly limited this argument to the Original TopOff Machines. Moreover, Imaginal cannot meet its burden of establishing collateral estoppel. The prior determination of liability concerned the Original TopOff Machines, and there has been no showing (nor could there be) that they are the same as the Redesigned TopOff Machines. Imaginal also has not shown that the analysis of damages would be identical for both the old and the new products. And, even if Imaginal had cleared those two

hurdles, its request still fails because (as the district court held in declining to calculate damages via collateral estoppel with regard to the *Original* TopOff Machines) there is no basis to convert the jury's lump-sum damages award into a per-use royalty.

## ARGUMENT

### I. THE JUDGMENT SHOULD BE AFFIRMED BECAUSE IMAGINAL'S PROPOSED CONSTRUCTION OF "VISION GUIDANCE SYSTEM" WOULD IMPERMISSIBLY NARROW THE CLAIM.

#### A. Imaginal's Proposal Contravenes Fundamental Canons of Claim Construction.

Imaginal makes one argument, and one argument alone, for reversing the determination of non-infringement: that the claim term "without the use of a vision guidance system" should be limited to mean "without the use of the vision guidance system of the '789 patent" (an interpretation that Imaginal sought to embody with its proposed construction "a system in which a camera is used to adjust the aim of the fastening tool to a target fastening location").[3]  Imaginal does not

---

[3] *See, e.g.*, OB7-8 ("[T]he phrase 'without the use of a vision guidance system,' as used in the '402 patent claims, is expressly defined by reference to the '789 patent, which is incorporated by reference into the '402 patent….  Therefore, in order to understand the meaning of the disputed claim term … it is necessary to understand the vision guidance

contend that the accused products infringe under the construction adopted by the court, or the similar construction proposed by Leggett and Simmons.  Accordingly, Imaginal could only prevail if its preferred construction were correct.  On the contrary, Imaginal's proposed construction violates basic principles of claim construction.  Applying de novo review, this Court should affirm.  *Fenner Invs., Ltd. v. Cellco P'ship*, No. 13-1640, 2015 U.S. App. LEXIS 2203, at *4 (Fed. Cir. Feb. 12, 2015) (citing *Teva Pharm. USA, Inc. v. Sandoz, Inc*., 135 S. Ct. 831, 841 (2015)) (claim construction based on intrinsic evidence is reviewed de novo).

1.  "Our analysis begins with the plain language of the claims themselves."  *Amazon.com, Inc. v. Barnesandnoble.com, Inc*., 239 F.3d 1343, 1353 (Fed. Cir. 2001); *see Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys*., *Inc.* 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("a claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to

---

system of the '789 patent.") (emphasis omitted); OB30 ("the patent only excludes the use of the vision guidance system of the '789 patent").

'particularly point[] out and distinctly claim[] the subject matter which

the patentee regards as his invention'") (quoting *Interactive Gift

Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir.

2001)).[4]

As noted above, step 7 claims

> moving the fastening tool *without the use of <u>a</u>
> <u>vision guidance system</u>* in a direction generally
> perpendicular relative to the base and through
> the open access area of a module until the
> fastening tool is located at a target fastening
> location.

A45, col. 6:15-19 (italics and underline added).  Nothing in the plain

language of this claim purports to restrict the term "vision guidance

system" to one vision guidance system in particular.  On the contrary,

the claim uses the term "vision guidance system" generically, and

---

[4] The principles of claim construction are familiar.  To determine
whether a construction comports with the claim term's ordinary
meaning, a court looks initially to intrinsic evidence, including the
claim language, the specification and the prosecution history.  *H-W
Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1332 (Fed. Cir. 2014)
(citing *Phillips*, 415 F.3d at 1314-17).  In addition, the court may
consider extrinsic evidence, which "consists of all evidence external to
the patent and prosecution history, including expert and inventor
testimony, dictionaries, and learned treatises."  *Phillips*, 415 F.3d at
1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980
(Fed. Cir. 1995)).

introduces it with the indefinite article "a." As "this court has
repeatedly emphasized[,] ... an indefinite article 'a' or 'an' in patent
parlance carries the meaning of 'one or more' …." *Baldwin Graphic
Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (quoting
*KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir.
2000)); *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 790
(Fed. Cir. 2010) (use of the indefinite article indicated that the claim
term covered different types of "rasterization processes"); *see also Novo
Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 601 F.3d 1359, 1364 (Fed.
Cir. 2010) ("When an indefinite article is preceded and qualified by a
negative, standard grammar generally provides that 'a' means 'any.'").
And this is no mere presumption.   "That 'a' or 'an' can mean 'one or
more' is best described *as a rule*." *Baldwin Graphic Sys.,* 512 F.3d at
1342.

Imaginal repeatedly and unambiguously confirmed the breadth of
the generic term "vision guidance system" during reexamination of the
'402 patent, and it should be held to those representations.  When a
patentee "distinguish[es] the claimed invention over the prior art, [the]
applicant is indicating what the claims do not cover, [and] is by

implication surrendering such protection." *Ekchian v. Home Depot, Inc.,* 104 F.3d 1299, 1304 (Fed. Cir. 1997).  This rule helps to ensure clarity and certainty in the patent system.  "[C]ompetitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000).

Here, Imaginal discussed at length the meaning of the claim term "vision guidance system."  It did so because the examiner initially rejected multiple claims (including the asserted claims here) as obvious in view of the '789 patent in combination with U.S. Patent No. 4,380,312 ("Landrus"), a manually operated industrial stapler.  *See* A834-38 (describing the basis for the rejection).  Given the negative claim limitation in step 7 ("without the use of a vision guidance system"), for it to read on the '789 patent and Landrus, those references in combination would have to render obvious a method performed without a vision guidance system.  The examiner indicated that they do just that when he initially rejected the claim, noting that "Landrus teaches moving, and thus positioning, a fastening tool without the use

of a vision guidance system." A837. To overcome this rejection,

Imaginal needed to find a way to show that Landrus—again, a

manually operated stapler—did indeed have a "vision guidance system."

The argument Imaginal made to the examiner was flatly at odds with

what it contends here. It argued that

> Landrus … fails to disclose "moving [the hand
> tool] without the use of a vision guidance system
> in a direction generally perpendicular relative to
> the base and through the open access area of a
> module." Specifically, workers using the hand
> tool would determine where to move the hand
> tool. *The workers' eyes serve as the vision
> guidance system for the hand-held stapler*.

A1305 (expert declaration of Robert Sturges) (quoting A885, response to

office action) (bold text omitted). To be clear: Whereas Imaginal now

argues that "vision guidance system" means only some sophisticated

embodiment of a vision guidance system reflected in the '789 patent,

Imaginal told the examiner that vision guidance system includes even

"[t]he workers' eyes." *Id.* It is as though, in our example above (at 1-2),

Nellie Knoll says now that "computer" can only mean a mainframe—but

had told the PTO that it includes a person doing calculations in her

head.

34

This was no isolated or passing statement.  Over and over, Imaginal told the examiner that "vision guidance system" includes eyeballs:  "[T]he combined art of Landrus and Durkos '789 does not teach or suggest any method or mechanism to guide the head of the stapler tool through the module to the target area *without a worker visually guiding the device* or the vision guidance system of Durkos '789."  A886, 898 (same); A897 ("guidance is performed by the visual guidance system of the worker holding the hand tool in Landrus or the visual guidance system of Durkos '789").  "[M]anual use of the entire stapling apparatus of *Landrus*," Imaginal represented, "would *necessarily require* visual guidance."  A938.[5]

Were that not enough, and directly relevant here, Imaginal told the examiner that he could not limit "vision guidance system," because

---

[5] Imaginal repeated this argument many more times.  *E.g.*, A930-31 (arguing that, in Landrus, "[a] person of ordinary skill in the art … would be required to visually inspect the places at which the driver staple 22 pushes through the workpiece.  Because *Landrus* includes a requirement of visual guidance, it is reasonable to characterize at least the portion of *Landrus* that facilitates the visual guidance as part of 'a vision guidance system.'"); A938 ("*Landrus* discloses visual guidance"); A939, 945-46 (arguing that the workers' eyes or the handle of the stapler may be a vision guidance system); A947.

to do so would be to impermissibly import a limitation from the specification into the claims.  A939 ("The Examiner should deny the Third Party Requester's request to import the word 'artificial' in conjunction with the phrase 'without the use of a vision guidance system,' into the claims from the specification.").  It "is well-settled law," Imaginal noted, "that it is improper to import claim limitations from the specification." *Id.*

 **2.**  That, however, is precisely what Imaginal now finds itself in the uncomfortable position of urging this Court to do—arguing that "vision guidance system" is limited by the specification to the "vision guidance system of the '789 patent." *E.g.*, OB34 ("the written description of the '402 patent manifestly excludes only the vision guidance system of the '789 patent"); *accord* OB7, OB30.  *But cf. Ericsson, Inc. v. D-Link Sys., Inc.,* 773 F.3d 1201, 1218 (Fed. Cir. 2014) ("[W]e 'avoid importing limitations from the specification into the claims.'") (quoting *Phillips*, 415 F.3d at 1323).  Even leaving aside its own previous disavowals, Imaginal cannot nearly satisfy the standard for importing a limitation from the specification into the claim language, or the equally taxing standard for overcoming the plain

36

meaning of the indefinite article "a." *Baldwin Graphic Sys.*, 512 F.3d at 1342 (to avoid application of the indefinite article rule, "a patentee must 'evince[] a clear intent' to limit 'a' or 'an' to 'one'") (quoting *KCJ Corp.*, 223 F.3d at 1356).

This is not, for instance, a situation in which "a patentee sets out a definition and acts as his own lexicographer." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (patentee must "'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning"). In *3M Innovative Properties Co. v. Avery Dennison Corp.*, for instance, the patentee did so by stating that "'Multiple embossed' means …." *See* 350 F.3d 1365, 1369, 1371 (Fed. Cir. 2004)). It would've been the simplest thing in the world to say that "'vision guidance system' means 'the vision guidance system of the '789 patent.'" Imaginal of course knew that it could define terms in this fashion; elsewhere in this patent it expressly defined the term "module." A43, col. 1:26-27 ("Therefore, the term 'module' as used herein is intended to cover ….").

Nor did Imaginal "disavow[] the full scope of a claim term either in the specification or during prosecution." *Thorner*, 669 F.3d at 1365. To meet this rigorous standard, the specification must include an "expression[] of manifest exclusion or restriction, representing a clear disavowal." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002); *accord Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (specification must "make[] clear that the invention does not include a particular feature"). The best Imaginal can muster is to assert that the specification of the '402 patent referenced the vision guidance system of the '789 patent. But, as the district court properly recognized, A7, to note that the invention "does not require the vision guidance of the '789 patent," A43, col. 1:50-51, doesn't mean that this is the *only* thing the invention excludes.

On the contrary, the specification recognizes that there are multiple types of "vision guidance system[s]." A44, col. 3:50-52. One is the "vision guidance system of the '789 patent." A43, col. 1:49-51; *see also* A43, col. 1:40-45. But the specification also recognizes that there are others:

> It is understood that the mechanical guide 32
> may also be used with a vision guidance system.
> In this embodiment, the vision guidance is less
> exact in guiding the stapler 30 directly to the
> target as in the '789 patent, but could provide
> vision guidance to an initial position adjacent
> each module.

A44, col. 3:49-54; *see also* A45, col. 5:22-26 ("As discussed above, vision

guidance (generally shown as sensor 31 in FIG. 1) may be used to

determine that the modules are in the standard positions and make

sure that the tool 30 is initially aligned with the module 14.").

Thus, as the district court recognized, the specification does not

manifestly exclude or restrict the meaning of "vision guidance system";

instead, the specification simply "uses the '789 patent in its preferred

embodiments as a general point of reference." A7. Imaginal identifies

nothing in the written description demonstrating that it intended the

claim to be read as referring *only* to the system of the '789 patent. In

fact, this Court has rejected the same contention in the face of even

more limiting language. In *Gemstar-TV Guide Int'l, Inc. v. ITC*, for

instance, even a statement in the specification that a particular feature

"is required" did not mean that the relevant claim term was limited to

that feature; rather, this statement merely "convey[ed] the advantages

of" that feature.  383 F.3d 1352, 1366 (Fed. Cir. 2004).  Imaginal has not

provided even that level of certainty here.[6]

**3.**  It would be particularly senseless to construe the negative

claim limitation "without the use of a vision guidance system" as

limited to "the vision guidance system of the '789 patent" because such

a limitation would provide no meaningful notice to the public.  *See*

*generally Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120,

2129 (2014).  That is because the '789 patent is not limited to any single

form of vision guidance system.  In fact, the '789 patent does not itself

use the term "vision guidance system," and it claims numerous different

types of vision guidance systems, with all manner of features and

variations.

As noted above (at 9-10), these range from the very simple (a

"camera providing an image signal indicative of an actual position of

---

[6] Confronted with the heavy burden of attempting to import a limitation from the specification into the claims, Imaginal argues that the analysis is different because "the term is part of a negative limitation."  OB33-34.  But it cites no case for this proposition, and the argument makes little sense.  The claim term, whether positive or negative, gets its full scope; the party seeking to limit the scope of the claim by using the specification must meet the standard for doing so.

the modules," A1125, col. 16:43-45 (Claim 1)) to the somewhat more complicated ("the camera is pivotably mounted to the support," A1126, col. 17:7-8 (Claim 6)). There are variations on the variations. *E.g.*, A1126, col. 17:9-11 (Claim 7: "the camera pivots about 10° from an initial position aligned generally perpendicular to the base"). There are more sophisticated vision guidance systems that include "memory for storing an optimum position for each of the modules" (A1125, col. 16:55-56 (Claim 2)); that compare the actual and optimum positions of the module (A1125-26, cols. 16:67-17:1 (Claim 4)); and that store images of the module and the designated targets for the tool (A1126, col. 17:43-59 (Claims 19-21)). One vision guidance system in the '789 patent can calculate the "position error of the module" (A1126, col. 17:51-55 (Claim 20)); others use *two* cameras to separately track different directional movements of the stapler (A1126, col. 17:33-42 (Claims 17-18)). It's as though Nellie Knoll originally identified in her '001 patent an array of calculators, laptops, servers, and mainframes in varying combinations of base-model configurations, souped-up processors, and different configurations of monitors.

41

Given the range of vision guidance systems claimed by the '789 patent, the '402 patent's reference in the specification to "the vision guidance system of the '789 patent" only makes sense as a general point of differentiation, but does not bear the precision that is required to define the bounds of a property right. *See United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942) (patentee must "clearly circumscribe what is foreclosed from future enterprise").  Presumably recognizing this difficulty, Imaginal contends that the *only* thing encompassed by the negative claim limitation is some particular embodiment of the '789 patent.  *E.g.*, OB7-12; 30-31.  But what Imaginal points to are lengthy descriptions of diagrams in the specification of the '789 patent—which themselves incorporate numerous limitations of multiple claims of the patent.  *See* OB10 (quoting A1120, col. 6:41-57); OB11 (quoting A1120, col. 6:15-41); OB30 (broadly citing A1108-09, 1118-20); *see also* A1002 (focusing on the use of gimbals, and citing A1118, col. 2:23-26).  These descriptions collectively incorporate (at least) aspects of Claim 9 (a gimbal, *see* A1126, col. 17:13-16), Claim 10 (a rotating tool, *see* A1126, col. 17:17-18), Claim 17 (twin cameras, *see* A1126, col. 17:34-37), and Claim 29

42

(vertical movement of the stapler, *see* A1126, col. 18:66-67), among others.

It is on this basis, however, that Imaginal arrives at its preferred definition:  A system where the camera is used to "adjust the aim" of the camera, a term that does not appear in either patent, and which Imaginal says reflects the vision guidance system of the '789 patent, *see* OB27, 30-31.  Imaginal seeks to limit the '402 patent's use of the term "vision guidance system" to "the vision guidance system of the '789 patent"; and then, to make that limitation comprehensible, to further limit it to one particularly sophisticated form of vision guidance system described in the '789 patent.  Now our Nellie Knoll is claiming that "computer" in her '002 patent means just one particularly sophisticated IBM computer out of the many that were mentioned in the '001 patent.  In effect, Imaginal seeks to do twice what this Court has "cautioned" against doing even once—"limiting the claimed invention to preferred embodiments or specific examples in the specification."  *Texas Instruments, Inc. v. U. S. Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir. 1986).

If the inventor had wanted to limit himself in the fashion Imaginal advocates, he easily could have disclaimed, for instance, "the vision guidance system of claim 9 of the '789 patent." Or he could have disclaimed any other, or several, of the numerous different systems that the '789 patent claims. And he certainly wasn't unaware of the '789 patent—not only did he cross-reference it; he is the named inventor on it. A1105. But he did not. Instead, he broadly disclaimed the generic category of "vision guidance systems"—and repeatedly told the PTO that that term includes even a stapler operator's eyes, *supra* at 34. Having made that choice, Imaginal cannot twist the meaning of the term by doubly limiting the disclaimer, as it now seeks to do. This is the "nose of wax" that the Supreme Court has warned of for more than a century, *White v. Dunbar*, 119 U.S. 47, 51 (1886), and it is flatly contrary to the Supreme Court's clear direction about the clarity required of patentees. *Nautilus*, 134 S. Ct. at 2129 (a "patent must be precise enough to afford clear notice of what is claimed" and "'the patent drafter is in the best position to resolve the ambiguity in … patent claims.'"); *accord 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1336 (Fed. Cir. 2013) ("When a term is ambiguous, … the

44

ambiguity should be construed against the draftsman.") (Plager, J.,

concurring).

## B. The District Court's Construction Is Consistent With The Claim Language And Specification.

Given the plain, broad, and common meaning of the words

"vision," "guidance," and "system," the district court construed "vision

guidance system" in a non-technical fashion.  That is the same approach

Imaginal advocated in an earlier appeal between these parties,

involving the construction of similarly non-technical terms from the

'402 and the '789 patents.  A1042-43 (Imaginal's proposed constructions

of (among other terms) "'mechanical guide,'" "'relative movement,'"

"'module alignment device,'" "'target fastening location,'" and

"'sensor/sensing'").  There, Imaginal recognized that such terms do not

have "a special, technical meaning in the field of art, and claim

construction therefore requires 'little more than the application of the

widely accepted meaning of commonly understood words.'"  Corrected

Non-Confidential Brief of Plaintiff-Appellee Imaginal Systematic, LLC

at 23, *Imaginal v. Leggett & Platt*, No. 12-1313 (Fed. Cir. Oct. 9, 2012),

ECF No. 37 (quoting *Phillips*, 415 F.3d at 1314).  That is what the

district court did here.

As the court recognized, A7, the term "vision guidance system" has no "particular meaning in [this] field of art." *Phillips*, 415 F.3d at 1314. Accordingly, the court explained—using the same language from *Phillips* that Imaginal quoted previously—that construing this term "involves little more than the application of the widely accepted meaning of commonly understood words." A6 (internal quotation marks omitted) (quoting *Phillips*, 415 F.3d at 1314). Such common understanding, this Court has explained, may be ascertained by reference "to general purpose dictionaries." *Phillips*, 415 F.3d at 1314.

Thus, the court explained that "'vision'" refers to "the ability to see: sight or eyesight." A7 (quoting merriam-webster.com, http://www.merriam-webster.com/dictionary/vision). Then, using the same dictionary that Imaginal brought to the court's attention, *see* A2007, the court concluded that "'guidance'" constitutes "the act of directing or controlling the path or course of something." A7. Broken down further, "'path'" means a "continuous series of positions or configurations that can be assumed in any motion," and "'course'" refers to the "path or direction that something or someone moves along." *Id.* Putting these terms together, the court construed "'vision guidance

46

system'" to mean a "'system that uses a vision or sight based method to control or direct the movement or direction of something.'" *Id.* This construction is similar to the one proposed by Defendants' expert. A1306 (quoting *The American Heritage Dictionary of the English Language* (4th ed., 2000) ("The plain and ordinary meaning of a vision guidance system is a set of things, such as equipment, connected together (i.e., a 'system') for the purpose of controlling or directing (i.e., 'guiding') by sight (i.e., by 'vision')").

Because Imaginal cannot prevail without narrowing the negative claim term to the point that it disclaims only one particular vision guidance system, Imaginal now argues that the district court "relied too heavily on general-purpose dictionary definitions" and thereby "'risk[ed] transforming the meaning of the claim term.'" OB32. But nothing about the district court's construction conflicts with the specification. As noted above (at 15-16), the '402 patent identifies multiple vision guidance systems, and each is a "system that uses a vision or sight based method to control or direct the movement or direction of something."

47

One example of a vision guidance system discussed in the specification is "the vision guidance system of the '789 patent." A43, col. 1:49-51. According to the specification, this is "a vision guided fastening apparatus which automatically locates the modules on the frame and then guides a fastener tool, such as a stapler, into proper position to secure the modules to the frame automatically." A43, col. 1:40-45. This plainly falls within the court's construction. Because it is "vision guided," it is a "'system that uses a vision or sight based method.'" And because it "guides a fastener tool," it "'control[s] or direct[s] the movement or direction of something.'" A7; A43, col. 1:40-45.

The same is true of the other type of vision guidance system discussed in the specification—i.e., one that "is less exact in guiding the stapler 30 directly to the target as in the '789 patent." A44, col. 3:51-52. This system "could provide vision guidance to an initial position adjacent each module." A44, col. 3:52-54. It too falls within the court's construction; it is a "system that uses a vision or sight based method," A7, because, by its terms, it uses vision guidance; and it "control[s] or direct[s] the movement or direction of something," *id.*, insofar as it

48

directs the stapler "to an initial position adjacent each module." A44, col. 3:53-54; *accord* A45, col. 5:22-26 ("As discussed above, vision guidance … may be used to determine that the modules are in the standard positions and make sure that the tool 30 is initially aligned with the module 14.").

Next, Imaginal argues that "the district court's construction improperly excludes a preferred embodiment where vision is used in the module alignment step." OB33 (citing A45, col. 5:22-33). This single-sentence assertion (two, if you count the subsequent citation) is not sufficient to preserve the argument for appeal, *Ajinomoto Co. v. ITC*, 597 F.3d 1267, 1278 (Fed. Cir. 2010) ("a conclusory assertion unaccompanied by developed argumentation does not preserve the issue for appeal"); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (requiring "developed argument"), not least because the argument is impossible to understand. Perhaps Imaginal means to say giving "vision guidance system" its full breadth would prevent the use of such a system during the "module alignment step" (step 6 of the method, *see supra* at 14). But that can't be right—the negative claim limitation is in step 7, and disclaims only a

49

particular *use* of a vision guidance system during that step; it has no

effect on the use of a vision guidance system during step 6, or uses of a

vision guidance system other than the one disclaimed in step 7.

Perhaps instead Imaginal means to argue that the court's

construction speaks of "movement," and that this construction would

exclude the preferred embodiment, which (it says) calls for use of a

vision guidance system at the module-alignment step (step 6) *without*

movement.  That also would be wrong.  The claim itself requires

movement (A45, col. 6:14 ("moving the module with the module

alignment device")), and the embodiment employing vision guidance

contemplates that the vision guidance system will *guide* the stapler "to

an initial position adjacent each module."  A44, col. 3:52-54.  This

should come as no surprise; the very purpose of guiding is to move in a

particular direction.[7]

---

[7] Moreover, the court's construction does not require movement in all circumstances; the vision guidance system is used "to control *or direct* the movement or direction of something."  A7.  The system remains in control when the tool is at rest, directing it to stay put and then commanding it to move at the appropriate time.  A1292 ("When it sees a row of modules is correctly aligned, the camera system stops the forward movement of the gripper carriages and causes the staplers to descend.").

Finally, and somewhat relatedly, Imaginal contends that the court misused the dictionary definitions that it employed. OB32-33. To define "vision guidance system," the court looked at the definition of "guidance" ("the act of directing or controlling the *path* or *course* of something"), then looked further at definitions of the words "path" and "course" that appear within that definition. A7. Both terms employ concepts of movement: A course is a "path or direction that something or someone *moves* along," and a path is a "continuous series of positions or configurations that can be assumed in any *motion*." *Id.* The court took these concepts together, and reasoned that a "vision guidance system" is a "system that uses a vision or sight based method to control or direct the movement or direction of something." *Id.* Imaginal objects to the use of the term "movement," but does not explain why, or how this distinction makes any difference. As Imaginal readily acknowledged below, a guidance system on a missile is a system that controls or directs the rocket's movement or direction. A2007. And Imaginal itself has characterized a vision guidance system as one that "adjusts the ... course of the device being guided to a target." *Id.* Not

surprisingly, then, and as noted above (at 50), the claims and the

specification are replete with references to "movement."

### C. Alternatively, Non-Infringement May Be Affirmed Under The Similar Construction Proposed By Defendants.

In the district court, Defendants proposed a construction of "vision

guidance system" that was similar to but less colloquial than the

construction that the court ultimately adopted.  As with the court's

construction, Imaginal does not deny that if Defendants' construction is

adopted, the determination of non-infringement must stand.

Specifically, Defendants proposed construing "vision guidance

system" to mean "an alignment system that uses a vision-based sensor."

A1331 (underlining omitted).  Like the court's construction, this

contemplates a vision-based sensor, and accounts for movement or

direction by indicating that the system engages in alignment.  *Id.*

Indeed, as noted above, a construction identified by Defendants' own

expert is strikingly similar to the district court's.  A1306 (the plain and

ordinary meaning of vision guidance system as "a set of things, such as

equipment, connected together (i.e., a 'system') for the purpose of

controlling or directing (i.e., 'guiding') by sight (i.e., by 'vision')").

According to Imaginal, this construction is wrong because it "changes the plain meaning of 'guidance,' which is not the same as alignment." OB35.  On the contrary, guidance and alignment are intimately related, and particularly in this context:  A guidance system is meant to align the stapler with the wire that it will staple to the frame.  A43, col. 1:53-55 ("The mechanical guide [of the present invention] guides the fastening tool into proper alignment with a target during the fastening process.").[8]  Indeed, Larry Durkos—the inventor named on both the '402 and '789 patents—said as much in the course of explaining the purpose of the vision guidance system:  "[T]he machine vision then begins to feed data to the computer, the controller *and aligns it*." A1477 (quoting A1842-43).  In addition, he explained, the reason he "need[ed] a vision system on th[e] invention" was because "the challenge is significant to *align* the stapler and the module." *Id.* (quoting A1842).  That the patent uses "guidance" and "alignment" in overlapping fashion is not surprising; as Imaginal itself acknowledges

---

[8] *See also* A45, col. 5:31-33 ("the mechanical guide **32** provides final alignment of the stapler head"); A45, col. 5:42-44 ("the mechanical guide **32** may also have a different structure to accomplish the alignment of the tool **30** with the fastening target").

(OB35), the patent uses the related term "steer" synonymously too. A44, col. 3:43.

Imaginal further argues that Defendants' construction is wrong because it "does not specify that it is the stapler that is guided by the vision guidance system." OB36. (Presumably Imaginal means that it is the stapler that is *not* guided, given the negative claim limitation.) But there is no need to include the stapler in the definition of "vision guidance system," because the surrounding claim language already does so. The relevant limitation (with the portion being construed in italics) claims "moving the fastening tool *without the use of a vision guidance system*." A45, col. 6:15-16. The stapler is already present, in the form of the "fastening tool," regardless how "vision guidance system" is construed.

Finally, Imaginal accuses Defendants of attempting to confuse step 6 ("moving the module") and step 7 ("moving the fastening tool"). OB36. But it is unclear how this is so, and Imaginal does not say. Imaginal comments in passing on an aspect of the accused products, *id.*, but that has nothing to do with construing the asserted claims. And it

says that Defendants' construction would foreclose the use of a vision guidance system in step 6, *id.*, but does not say why.

### D. The Determination Of Non-Infringement Should Be Affirmed, And Certainly There Is No Basis To Enter A Judgment Of Infringement.

Imaginal has not argued that there could be infringement under the district court's construction, and has not challenged the court's resulting determination of non-infringement. *See* A8-10. Accordingly, if the court's construction is affirmed, the determination of non-infringement must be.

Imaginal also does not contend that there could be infringement under the claim construction advanced by Defendants. Imaginal attacks this construction, *see* OB34-36; *supra* Section I.C., but nowhere denies that adopting this construction, like the district court's, necessarily leads to a determination of non-infringement. Any such argument therefore is forfeited, and with good reason: As the court recognized, both experts agreed that the Cognex System—the system used by the Redesigned TopOff Machines— employs a vision-based sensor. A9. And that system plainly engages in alignment; it is responsible for moving the grid of modules and aligning them below the

row of staplers.  A1292 ("When it sees a row of modules is correctly

aligned, the camera system stops the forward movement of the gripper

carriages and causes the staplers to descend.")  It then controls the

descent of the staples while monitoring their path to ensure proper

alignment.  If, at any point, the sensor sees misalignment, the System

stops the descent, realigns the grid, and directs the stapler to continue

its descent.  *Id.*  It then repeats the process.  A9-10, 1293.  Therefore,

under Defendants' claim construction, affirmance also is appropriate.

Imaginal does not dispute any of this.  Instead, it argues that if

the Court adopts *its* claim construction, the Court should enter

judgment of infringement in Imaginal's favor, as a matter of law.  But

there is more than sufficient evidence for a jury to conclude that the

Redesigned TopOff Machines do not infringe under Imaginal's

construction.  As discussed above (at 29, 43), Imaginal says that a vision

guidance system is a system that uses "a camera to adjust the aim of

the fastening tool to a target fastening location."  OB36 (underlining

omitted); *see also* OB31, 40.  That is precisely what the Redesigned

TopOff Machines do, and surely a jury could so find.  The vision

guidance system in those machines monitors the stapler's downward

movement; if at any point during its descent, the camera sees that the

stapler is misaligned, the camera stops the stapler or causes it to

ascend, and readjusts the stapler's aim by moving the grid.  A1292-93;

*supra* at 19; A988 (Supplemental Video Appendix, Ex. 7).  Imaginal

surely will argue that this is not what it means to "adjust the aim" of

the stapler, but any ambiguity about the meaning of that phrase—

which is part of Imaginal's proposed construction and not present in the

patent—is just more reason not to adopt that construction.  In any

event, whether the accused products in fact "adjust the aim" is an

argument to be resolved by the factfinder in the first instance.

## II.   IF THE COURT REVERSES THE CONSTRUCTION OF "VISION GUIDANCE SYSTEM" AND REMANDS, IT ALSO SHOULD REVERSE THE DISTRICT COURT'S CONSTRUCTION OF "MOVING THE MODULE WITH THE MODULE ALIGNMENT DEVICE."

For all of the reasons set forth above, the court should affirm the

district court's construction of "vision guidance system," or in the

alternative the similar construction proposed by Defendants, and

therefore affirm the determination of non-infringement.  If, however,

the Court modifies that construction and remands, it also should revisit

and reverse the district court's construction of a separate claim term:

"moving the module with the module alignment device."  *See* A45, col. 6:14.

To see why this is so, we begin with a bit of history about the creation of the Redesigned TopOff Machines.  The claim requires two movements each time a staple is fastened:  The stapler must descend, and the module must be moved with the module alignment device.  A45, col. 6:14-19.  Step 7, discussed above, pertains to the former.  A45, col. 6:15-19.  Step 6 addresses the movement of the module.  A45, col. 6:14.  Before Leggett redesigned the machines, they included staplers to which were attached (at the nose) a mechanism known as a "'gripper foot.'"  A1044 (district court order from First Lawsuit); A1283 (Defendants' expert report).  As the stapler descended, the gripper foot would engage the base wire of the single module located below it and help position the module directly underneath the stapler's nose.  *Id.*

In the First Lawsuit, the district court construed "'module alignment device'" to mean "'a device that aligns the module and the stapler, or the module and the frame.'"  A1042.  That construction led the court to conclude that the gripper feet on the Original TopOff Machines read on step 6 of the '402 patent.  A1046.  Thus, when Leggett

went back to the drawing board, it removed the gripper feet. A5. Without the gripper feet, there is no way to move a single module; the modules only move when the grid of modules is moved.

In the Second Lawsuit, a different aspect of step 6 was at issue. No one sought to revisit the district court's earlier construction of "module alignment device," but there was briefing about how to construe the phrase "'moving the module with the module alignment device.'" A7. Defendants proposed construing it as "moving *a single module of a plurality of modules* with the module alignment device," A1337, as the gripper feet were found to have done. Imaginal did not propose a construction. *Id.* The district court rejected Defendants' contention that "'moving the module'" meant moving one module, and instead construed the phrase to mean "'moving a single module *(by directly or indirectly moving either that module or the unit of modules in which the single module is contained)*, using a device that aligns the module and stapler, or the module and the frame.'" A7.

The court erred in construing this term to permit moving the whole rack of modules. The claim language, the specification, and the prosecution history all indicate that only a single module is being

moved.  Beginning with the claim language, step 6 speaks plainly in terms of a single module: "moving *the* module."  A45, col. 6:14. Imaginal's use of the definite article "the" rather than the indefinite article "a" demonstrates it intended the term "module" in step 6 to be specific and limited.  *Supra* at 32 (citing cases).  Indeed, the very case cited by Imaginal explains that "the use of a definite article ('said' or 'the')" refers to the singular unless it "refer[s] back to an initial indefinite article."  *Baldwin Graphic Sys.*, 512 F.3d at 1342-43 (cited at OB38).  Where Imaginal goes astray is in identifying what "the module" refers back to.  Imaginal says "the module" refers back to "locating *a plurality of spring modules*."  OB38.  Instead, the term refers to "*each* module having a top portion spaced apart."  A45, col. 6:4; A45, col. 6:9-10 ("the first and second side portions of *the* module").

Notably, the district court itself acknowledged that "'*the* module' indicates a single module among a plurality of modules"—but then concluded that "there is nothing in the claim language or the specification that excludes movement of a single module by moving the entire unit of modules that is comprised of a plurality of modules."  A7. This conclusion is contrary not only to the claim language, but also the

specification.  In two separate places, the specification references

module alignment devices.  Both times, these devices are described as

moving "the module"—meaning a single module:

> [E]ither the mechanical guide 32 or *the alignment tool* 25 may perform the step of moving *the module* 14 and/or *the tool* 30 to compensate for misalignment of *the module* 14 relative to at least one of the frame section 22 and/or the fastening tool 30 before the module 14 is secured to the frame section 22 ….

A44, col. 3:25-32.  That the module alignment device moves only a

single module at a time is underscored by the patent's illustrated

embodiment.  There, the mechanical device engages a single module at

a time and does not cause the movement of a plurality of modules.  A43,

col. 1:65-67 ("The mechanical guide is configured to engage *the* module

to guide the tool to a target fastening location on the module."); *see also*

A43, col. 2:33-48; A39-42 (Figures 3, 4, 5, 6, and 7).

The prosecution history confirms that "moving the module with

the module alignment device" connotes moving a single module.  During

reexamination of the '402 patent, the examiner found claim 1 invalid as

obvious over a combination of three pieces of prior art, including the

'789 patent.  A979-80.  In response to the examiner's initial rejection,

Imaginal distinguished the prior art as disclosing movement of multiple modules, whereas it said the '402 patent does not. Specifically, it said, the prior-art references do not "disclose 'a module alignment device' for moving *a module of a plurality of modules*." A981. And, as to the '789 patent in particular, Imaginal argued, "[i]f the paddles of Durkos '789 extended between the supports to push the modules of the rigid structure of the ['064 patent], the paddles would not appear to move a single module *but rather appear to move the entire module structure*." *Id.* That is precisely the point of differentiation that is at issue here— whether the whole module structure is moved, or just one module.

It is "a fundamental precept in [this Court's] claim construction jurisprudence," *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003), that when, as here, a patentee "distinguish[es] the claimed invention over the prior art, [the] applicant is indicating what the claims do not cover, [and] is by implication surrendering such protection," *Ekchian*, 104 F.3d at 1304. *See also Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1373 (Fed. Cir. 2005); *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002). That is what Imaginal did here to preserve its patent, and it should be held to its representations.

Imaginal offers three responses.  First, it suggests that this Court should reform the district court's claim construction which, it says, "may be unnecessarily complicated."  OB38 (proposing the construction "*moving one or more modules with the module alignment device*") (emphasis in original).  But Imaginal did not propose this—or indeed any—claim construction in the district court.  It is impermissible to "adopt[] a new claim construction position on appeal."  *Interactive Gift*, 256 F.3d at 1346 (citing cases); *see Syngenta Seeds, Inc. v. Monsanto Co.*, 231 Fed. App'x. 954, 960 (Fed. Cir. 2007) ("The doctrine of waiver precludes a party from advocating a new theory of claim constriction on appeal.").

Second, in defense of the court's construction, Imaginal correctly notes that whereas step 6 refers to "the module," elsewhere the claims and the specification speak of "'module<u>s</u>'" in the plural.  OB38-39.  But that only supports Defendants' point.  When the inventor wanted to speak about plural modules, he knew how to do so.  Indeed, within the very claim step emphasized by Imaginal here, *see* OB38, the patent separately used the terms "plurality of modules" and "the module," A45, col. 6:1-11.  It is elementary that "the use of two terms in a claim

requires that they connote different *meanings.*" *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) (emphasis in original).  Indeed, even when "different words or phrases are used in separate claims," "[t]here is presumed to be a difference in meaning and scope." *Tandon Corp. v. U.S. Int'l Trade Comm'n.*, 831 F.2d 1017, 1023 (Fed. Cir. 1987).

Third, Imaginal contends that Leggett's proposed construction would circumvent the district court's earlier construction.  On the contrary, the district court previously construed "module alignment device," A7, but it had no occasion to consider whether that device moves one module, or more than one module, at a time.  And there is no inconsistency between the constructions.

Notably, it is undisputed that the Redesigned TopOff Machines do not infringe under the construction we propose.  It is plain from the record—and Imaginal has not disputed—that the Modified TopOff Machine's alignment device never moves a single module at a time. Rather, all modules are moved at once.  A2693; *see also* A7-8, 988 (Supplemental Video Appendix, Ex. 4).  This, as noted above (at 18-19), was a key innovation of the redesign.  The gripper feet in the Original

64

TopOff Machines moved a single module at a time (as does the

invention depicted in Imaginal's preferred embodiment, *see* A43, col.

2:33-48).  Leggett properly worked around this step of the method by

removing the gripper feet, thereby creating a module alignment system

that moves all of the modules at once by pulling the entire grid of

modules forward.  Accordingly, were this Court to revisit the district

court's construction, it should affirm on this basis in the alternative,

because the record is clear that there can be no infringement under this

construction.

## III.   THIS COURT SHOULD NOT ASSESS DAMAGES IN THE FIRST INSTANCE BECAUSE IMAGINAL'S COLLATERAL ESTOPPEL THEORY IS BOTH WAIVED AND MISTAKEN.

Finally, Imaginal makes an argument that can only charitably be

described as bold.  Having suffered an adverse determination on

liability—that is, a determination that Leggett's Redesigned TopOff

Machines do not infringe—Imaginal not only asks this Court to enter

judgment of infringement in its favor, OB40; it also asks this Court to

assess damages for the first time on appeal, based on a theory of

collateral estoppel.  OB41-48.  This argument is both waived and wrong.

**A.** Imaginal's argument is waived because Imaginal never made it below, and therefore cannot do so for the first time here. "This court will not consider arguments raised for the first time on appeal." *Energy Transp. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012); *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) ("[T]his court does not 'review' that which was not presented to the district court.").

Recall that in this Second Lawsuit, Imaginal alleged infringement by the Original TopOff Machines (for the period following the judgment in the First Lawsuit) and by the Redesigned TopOff Machines. *Supra* at 20-21. Imaginal filed a motion in which it asked the district court to apply the liability determination and the damages award from the First Lawsuit. A323-26. But Imaginal explicitly limited this argument to new infringement by the *old* TopOff Machines—it stated clearly that "[t]his motion *only concerns the 'Pre-Modification TopOff'*

*machines.*"[9]  A310 .  That is precisely why the district court discussed

collateral estoppel only in the section of its order addressing the

Original TopOff Machines.   A4-5.  Having failed to raise the issue as to

the Redesigned TopOff Machines in the district court, Imaginal cannot

do so here for the first time.

**B.**  Imaginal's argument also is wrong because Imaginal has not

satisfied its burden of proving that "the issue to be decided is identical

to one decided in the first action," much less that the issue "was

actually litigated" there, or "essential to a final judgment."  OB41.  This

issue is reviewed de novo,[10] and it is one on which Imaginal bears the

burden of proof.  *See RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d

1255, 1261 (Fed. Cir. 2003); *In re Lambert*, 233 Fed. App'x. 598, 600

(9th Cir. 2007) (same).

---

[9] *See also* A2669 (in the stipulation settling most of the litigation, confirming that nothing in that stipulation "affects the right of … Imaginal … to pursue an appeal *of the rulings in the Summary Judgment Order*," which did not address this issue with regard to the Redesigned TopOff Machines) .

[10] *Wolfson v. Brammer*, 616 F.3d 1045, 1064 (9th Cir. 2010); *e.Digital Corp. v. Futurewei Techs., Inc.*, 772 F.3d 723, 726 (Fed. Cir. 2014) (applying regional circuit law regarding collateral estoppel).

To import a determination of even just *liability* from an earlier lawsuit—leave aside damages—Imaginal acknowledges it would have to show that the "the accused TopOff machines are the *same machines* found to infringe in the First Case." OB45; *see Nystrom v. Trex Co.*, 580 F.3d 1281, 1285 (Fed. Cir. 2009) (products must be "'essentially the same'"); *Applied Med. Res. Corp. v. U.S Surgical Corp.*, 435 F.3d 1356, 1362 (Fed. Cir. 2006) (where there is a "different product," or "different infringement issues," there must be a "separate evaluation" of damages). But the products are not the same: At issue in the First Litigation were the Original TopOff Machines, whereas at issue here are the Redesigned TopOff Machines. The infringement issues also are different. Imaginal's theory here is that the Redesigned TopOff Machines read on step 7 of Claim 1 by using a "vision guidance system" that is not prohibited by the '402 patent—a term that was not even construed in the First Lawsuit. *Compare* A1004-05, 1009 (Imaginal's claim construction summary judgment briefing below) *with* A1042-43 (identifying construed terms in First Lawsuit).

Imaginal has not attempted to meet the burden of showing the same type of infringement. It presupposes that the same products are

68

at issue,[11] but never shows this to be so.  The same is true of Imaginal's

effort to distinguish one of the key cases, *Applied Medical*.  OB45.  That

case also involved collateral estoppel relating to liability and damages

for redesigned products.  *Applied Medical*, 435 F.3d at 1361-62.

Imaginal seeks to distinguish that case on the theory that there, "the

infringement at issue in the [second] case involved *different products*."

OB45 (emphasis in original).  But in cutting and pasting this portion of

its district court brief, *compare* OB44-45 *with* A324-25, which addressed

only the Original TopOff Machines, Imaginal has left out the step of

actually showing that the products here are the same, which they are

not.  That is why *Applied Medical* is dispositive rather than

distinguishable.  In words that could have been written for this case,

the Court held that "the issue of reasonable royalty damages for

Versaport II sales could not have been and was not considered, much

less decided, in *Applied I* because that product had not yet been

---

[11] *See, e.g.*, OB45 ("Here, … the accused TopOff machines are the same
machines found to infringe in the First Case."); OB46 (damages award
"in the First Case [should] fix the rate of damages in this case for the
use of the same infringing machines based on collateral estoppel");
OB48 (warning of a risk of "inconsistent decisions … for infringement
by the same machines").

determined to infringe." *Applied Medical*, 435 F.3d at 1362. So too here.

Imaginal also fails to explain how the damages award for the old products can be applied to the new products. Any such analysis of course would require analysis and application of the multi-factor *Georgia-Pacific* test, which by its nature is intensely factual. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *Lucent Techs., Inc. v. Gateway*, 580 F.3d 1301, 1310, 1335-36 (Fed. Cir. 2009) (reviewing jury's application of the *Georgia-Pacific* factors for substantial evidence). For instance, the parties intensely disputed the proper date for the hypothetical negotiation, which was not resolved. And Imaginal itself has acknowledged that certain facts and circumstances were "different for a hypothetical negotiation at the time of the jury's verdict [in the First Lawsuit] on January 24, 2012." A1481 (internal quotation mark omitted). *See Applied Medical*, 435 F.3d at 1361 ("the issue of reasonable royalty damages in [the second case] is not identical to the issue of reasonable royalty damages in [the first case] because the infringements requiring compensation began at separate and distinct times"). But whatever

70

similarities or dissimilarities there may have been between the royalty

analyses necessary for each lawsuit, that is a showing that Imaginal

bore the burden of making, and it never did so.

Even if Imaginal had tried to show that the products were the

same, that the infringement was the same, and that the damages

analysis was the same, it still would fail because it cannot justify

converting the jury's lump-sum award in the First Litigation for the

Original TopOff Machines into a per-use royalty here.  As the district

court recognized (in the context of addressing Imaginal's collateral-

estoppel arguments regarding the *Original* TopOff Machines), "[i]t is

completely unknown whether the jury used Imaginal's proposed $0.44

royalty rate, or a different method of calculation, to arrive at its result."

A5.  That's because, contrary to Imaginal's suggestion, OB42, the jury

never was asked to resolve a per-use royalty rate, let alone to award the

specific $0.44 per-use figure Imaginal now seeks.  *Id.*

The jury was simply asked "to arrive at a 'total amount to

compensate Imaginal for the use made of the patented invention by

[D]efendants up to the date of [the] verdict'" and then identify the sum

that should be apportioned to Simmons.  *Id.* (quoting A370); *see also*

A346.  Because "[t]he jury was never asked to disclose the process by which it determined the damages award," the district court properly refused to "speculate as to [the jury's calculation of] that process."  A5. That is particularly appropriate here, given the jury's round-number verdict of $5 million, A370—which strongly suggests that the jury did not have in mind, or mean to assess, a per-use royalty.  "[B]ecause of the black-box quality of the jury decision, we simply do not know what the jury did to arrive at its damages award."  *Bradford Co. v. Jefferson Smurfit Corp.*, Nos. 00-1511, 00-1546, 2001 U.S. App. LEXIS 25205, at *13 (Fed. Cir. Oct. 30, 2001); *Apple, Inc. v. Samsung Elecs. Co.*, 926 F. Supp. 2d 1100, 1106 (N.D. Cal. 2013) ("Here, the jury did not make a finding as to the appropriate royalty rate, and the Court cannot now do so without trenching on Samsung's  Seventh Amendment right to a jury trial on that issue.").[12]

---

[12] For these same reasons, collateral estoppel also is inappropriate if, contrary to expectation, Imaginal seeks to set a royalty rate via collateral estoppel for the *Original* TopOff Machines.  Imaginal's brief nowhere asks for that relief, *see* generally OB41-42, and with good reason.  The settlement agreement resolved all issues pertaining to the Original TopOff Machines through September 26, 2014, *see* A2667-69, by which time all machines had been redesigned, *see, e.g.*, A2707.  There could be no basis to apply a reasonable royalty to future acts of

Imaginal's request that this Court set a reasonable royalty in the first instance—derived from a lump-sum award in a previous case involving different products, under a collateral estoppel theory neither pressed nor passed upon below—should be denied.

## CONCLUSION

For the foregoing reasons, the district court's summary judgment determination should be affirmed.

---

hypothetical infringement regarding settled claims.  And, even if there were, collateral estoppel still does not apply for the reasons set forth above, including differences in the date of the hypothetical negotiation.

Date:  March 9, 2015          Respectfully submitted,

/s/ Eric A. Shumsky
Eric A. Shumsky
Orrick, Herrington & Sutcliffe LLP
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone:  (202) 339-8400

*Counsel for Defendants-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Answering Brief of Defendants-Appellees Leggett & Platt, Inc. and Simmons Bedding Company for the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on March 9, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date:  March 9, 2015        Orrick, Herrington & Sutcliffe LLP

/s/ Eric A. Shumsky
Eric A. Shumsky
*Counsel for Defendants-Appellees*
*Leggett & Platt, Incorporated and Simmons*
*Bedding Company*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 13,981 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook 14-point font.

Date:  March 9, 2015        Orrick, Herrington & Sutcliffe LLP

/s/ Eric A. Shumsky
Eric A. Shumsky
*Counsel for Defendants-Appellees*
*Leggett & Platt, Incorporated and Simmons*
*Bedding Company*

'402 patent (claim 8)

8. A method of forming a portion of a box spring or mattress foundation, the method comprising:

providing a base;

locating a wood frame on the base, the wood frame including a plurality of frame sections;

locating a plurality of spring modules above the frame, each module having a bottom portion positioned on one of the frame sections;

locating a fastening tool above the base, the fastening tool being initially spaced apart from the plurality of spring modules and the frame;

providing a module alignment device;

moving the module with the module alignment device to compensate for misalignment of the module relative to at least one of the frame section and the fastening tool;

moving the fastening tool relative to the base, the plurality of spring modules and the frame without the use of a vision guidance system until the fastening tool is located at a target fastening location; and

securing the bottom portion of the module to the frame at the target fastening location with the fastening tool.

A45, col. 6:43-64